## THOMPSON *v.* THE STATE, EX REL. McKINNEY.

[No. 1,891. Filed September 29, 1896.]

BRIBERY.—*Hiring Elector to Refrain from Voting.*—Within the meaning of section 6325, Burns' R. S. 1894 (1396, E. S.), providing that whoever hires any elector to vote or refrain from voting any ticket, or for any candidate, shall become liable to the person hired to vote or to refrain from voting in the penalty of $300.00, it is not essential to a "hiring" that the elector shall have actually carried out his agreement to vote or refrain from voting.

From the Gibson Circuit Court. *Affirmed.*

*B. M. Willoughby, Chambers, Pickens & Moores, W. F. Townsend* and *John Wilhelm,* for appellant.

*W. A. Cullop, C. B. Kessinger, J. S. Pritchett* and *Thomas. C. Duncan,* for appellee.

Ross, J.—This action was brought by the relator, John McKinney against the appellant, for an alleged violation of section 6325, Burns' R. S. 1894 (1396, E. S.), and to recover the penalty prescribed therein. This section reads as follows:

"That whoever hires or buys, directly or indirectly,

or handles any money or other means, knowing the same is to be used to induce, hire or buy any person to vote or refrain from voting any ticket or for any candidate for any office at any election held pursuant to law, or at any primary election or convention of any political party, then the person so offending in any one of the foregoing particulars, and all other persons aiding, abetting, counseling, encouraging or advising such acts, shall thereby become liable jointly and severally to the person hired, bought or induced to vote or refrain from voting by the means above enumerated, in the sum of three hundred dollars and reasonable attorney's fees for collecting the same in an action to be brought as hereinafter provided on the relation of the voter in whose favor the liability is created by this section."

It is charged in the complaint that on Tuesday the 8th day of November, 1892, a general election was held in the United States and in the State of Indiana for President and Vice President of the United States, and for electors to vote for President and Vice President of the United States; for Representatives in Congress and for State and county officers in the State of Indiana. That the relator was a duly qualified and legal voter at said election at the first ward precinct in the City of Vincennes, Knox County, Indiana, and on that day he went to said voting place for the purpose of exercising his right of franchise, and of casting his vote for the candidates of his choice, but that the defendant unlawfully gave and paid relator the sum of five dollars not to vote, and to go away without voting, and to refrain from voting; that relator accepted said money for said purpose and went away from said polls without voting. That he went to the polls for the purpose of voting, but that the defendant by the payment of said sum of money did hire, in-

duce and buy the relator to refrain from voting at such time, the ticket and candidates of his choice.

We deem it unnecessary to set forth the complaint in full, inasmuch as the above extract sufficiently shows the theory upon which the complaint proceeds, and will enable us to pass upon the questions urged on this appeal.

The main contention of the appellant is that there can be no recovery, unless it is shown, in addition to the fact that the relator was hired by the appellant to refrain from voting, that he did not in fact cast a vote at said election; that if he was hired to go away from the polls and refrain from voting at the time he went there for that purpose, but subsequently returned and then cast his vote, no offense was committed; that if he did eventually cast his vote, no damage was done, the relator lost no right, hence no right of action accrued.

The framers of both our national and state constitutions intended that all citizens should have a voice in the government of this country, and to that end guaranteed to each the right of suffrage.

For many years the lawmakers of our State have been striving to formulate laws that will secure the purity and freedom of the ballot; to place such safeguards around the voter that he may freely exercise the right of suffrage and cast his ballot for the ticket or candidate of his choice. This right of suffrage granted to an American citizen, whether manor born or naturalized, is the highest, greatest, and most sacred privilege accorded to man, and is enjoyed to its fullest extent only when the right to exercise it is untrammeled and free. It is a prerogative so sacred that it should not be the subject of barter and sale. It was not designed as a commodity to be placed upon the market and sold to the highest bidder. It is a lib-

erty, an inalienable right, granted to the individual vouchsafing the equality of all men under a free government. This birthright given to all citizens alike should be most sacredly guarded, and for this reason the knowledge on the part of our lawmakers that it might not be fully appreciated by all to whom it is granted, or that some, who from stress of circumstances should underestimate its value and be willing to part with it for gain, has resulted in the enactment of laws which make not only the one who will thus barter and sacrifice "his honor, his manhood, his political freedom" and "his sovereignty," a criminal, but also brands the one who makes the purchase, furnishes the money, or aids or abets, as a felon.

By section 2341, Burns' R. S. 1894 (2193, R. S. 1881), it is provided that whoever for the purpose of influencing a voter, seeks by violence or threats of violence, or threats to enforce the payment of a debt or to eject or threaten to eject from any house or to injure the business or trade of an elector; or if an employer of laborers or an agent of such employer, threatens to dismiss from service any laborer in his employment, shall be fined not more than $1,000 nor less than $20 and imprisonment in the State prison not more than five nor less than one year.

The latter part of this section makes it a crime for an employer or his agent to seek to influence an employe in voting by means of threats to dismiss him from the service.

The object aimed at by our lawmakers has been to prevent both coercion and temptation. It is not always only the corrupt or dishonest voter that when tempted, will part with his honor, his manhood, yea, even his liberty itself, for often times circumstances are such that to refuse means, not only poverty and want for the voter himself, but hunger, misery and

suffering for his family. When the wealth of the rich, or the strong and powerful influence of the employer is used to so debase mankind, it is well that the law has placed its protecting arm about those so unfortunate as to be subjected to such temptation.

At the same time that the act, of which the section under consideration is a part was passed, another act was enacted, making it a misdemeanor for any person either to "give or offer to give, directly or indirectly, any money, property or other thing of value, to any elector to influence his vote at any regular election," section 2329, Burns' R. S. 1894 (E. S. 321), or to give, offer or promise to give any elector any money, property or thing of value for the purpose of preventing, influencing, inducing or procuring him to refrain from voting or to remain away from the polls. Section 2330, Burns' R. S. 1894 (E. S. 322).

The object and purpose of these two acts, says the court in the case of *State, ex rel.*, v. *Schoonover*, 135 Ind. 526, "were to detect and punish vote buying, and suppress the traffic in human honor, even, if to do so, it became necessary to offer and bestow a premium on one of the culprits. The sanctity of the ballot, the freedom and purity of our elections, were, to them, (the general assembly) of paramount importance to everything else; hence, the one act provided for a civil penalty, and the other for a criminal prosecution for the offense in question, so as to open every avenue to its discovery. Our lawmakers, in their wisdom, concluded to exempt the weak from punishment, and inflict it on the strong. It is an innovation of the policy of the old law, but the act of making merchandise of manhood is of great moral turpitude, the disease was desperate, the remedy heroic, and whether they legislated wisely or not is not for us to say."

The section of the statute under which this action was instituted defines a number of offenses, namely:

1st, for hiring or buying any person, directly or indirectly, to vote any ticket or for any particular candidate; 2d, for hiring or buying any person, directly or indirectly, to refrain from voting any ticket or for any candidate; 3d, for handling any money or other means, knowing the same is to be used to induce, hire or buy any person either to vote or to refrain from voting any ticket or for any candidate; and 4th, for aiding, abetting, counseling, encouraging or advising either the hiring or buying of a voter either to vote or to refrain from voting any ticket or for any candidate. Any person, therefore, who hires or buys, directly or indirectly, a voter to vote any ticket or for any particular candidate or who hires or buys such voter to refrain from voting any ticket, or for any candidate, or who handles any money or other means to be used to induce, hire or buy any voter, either to vote or to refrain from voting, any ticket, or for any candidate, or who aids, abets, counsels, encourages or advises, either the hiring or buying of a voter either to vote any particular ticket, or for any particular candidate, or to refrain from voting any ticket or for any candidate, is liable under the provisions of said act.

But we are asked to hold that no offense was committed in this instance, unless the relator actually did not cast a vote at the election at which he was hired by the appellant to refrain from voting. Such a construction of the statute would, we think, be a strained one. The plain language of the act conveys to the ordinary mind that the intention of the legislature was to punish the person who hires the voter either to vote or refrain from voting any ticket, or for any candidate whether the voter fulfills his part of the agreement or not. The purpose of the act is to prevent any one from hiring or buying a voter either to vote or to re-

frain from voting, and not simply to punish because the voter has carried out his agreement. Ordinarily one who makes a contract understandingly, and then purposely refuses to fulfill it, commits a moral wrong, but one who agrees either to vote a ticket or for a candidate other than the ticket or candidate of his choice, commits an unpardonable sin, if he carries out his agreement. It is neither a legal nor a moral wrong to repudiate that which our laws forbid. All of our laws are enacted for the purpose of insuring the peace, prosperity, protection and good behavior of all the people, and to observe them insures good government, while to disregard them brings about disorder, dishonesty and often threatens the stability of the government itself.

The offense charged does not consist in inducing the voter, by hiring him to vote or to refrain from voting a particular ticket or for or against a particular candidate, but it consists in the giving or agreeing to give to the voter something in consideration that he will or will not vote, and the agreement on the part of the voter to so do.

When the appellant gave the relator $5.00 to refrain from voting and the latter accepted the money, agreeing not to cast his vote, the hiring was completed, the appellant fulfilled his part of the contract, the statute was violated and the right of action accrued. For instance, if, as charged in the complaint, the defendant gave the relator $5.00 in consideration of which the latter agreed not to vote at said election, the hiring was complete, whether he subsequently voted or not. The language of the statute is plain and unambiguous, and forbids not only the execution, but the making of such contracts. To hire, in its general sense, means the entering into a contract, by which one party agrees to do or refrain from doing some particu-

lar thing, and on the part of the other an agreement to pay therefor. Of course the ordinary contract of hiring cannot be enforced by one of the parties against the other, unless the party seeking its enforcement has performed or offered to perform his part thereof. The legislature, in the use of the word hire, in this act, did not have in contemplation its use with reference to enforceable contracts, but having in view an evil to be corrected, made use of it in its plainest and broadest sense, for they declare that the person who directly or indirectly hires a voter to vote or refrain from voting, etc., shall become liable to such voter in the sum of $300.00.

The evident purpose of the legislature was not only to prevent parties from knowingly entering into such contracts, but also to prevent one party from making, by any subterfuge, trick or artifice, any contract or agreement which will prevent the other party from voting any ticket or for or against any candidate. It is no less an offense, under this statute, to hire a voter to change his place of residence, and thus lose his vote, than to hire him to remain away or to go away from the polls and not vote. One who induces a voter, for a consideration to change his residence at a time when to move will destroy his right to vote, even though the real purpose may not be understood by the voter, if done for the purpose of preventing his voting or destroying his right to vote, as also all others aiding, abetting, counseling, encouraging or advising such acts, shall be liable to the person thus hired, as provided in such section.

It is to be regretted that the necessities of the law require, in order to compel an observance of its provisions, that one of the parties to such an infamous contract should be made a beneficiary, but if it were

not so it would be almost impossible to detect and punish the real criminal.

It is earnestly insisted that the evidence is insufficient to sustain the verdict. In cases of this character the evidence which can be produced to establish the offense is necessarily meagre and limited, because such transactions are usually entered into secretly, with no one present except the parties to it; but when a jury, consisting of the peers òf the accused, after hearing the testimony of the parties and being fully advised of the circumstances surrounding the transaction, choose to disbelieve him and to believe the evidence which shows him to be guilty of the crime charged, especially after the trial court has approved the verdict and declared the trial a fair one, this court will not review it if there is any reasonable evidence to sustain the verdict. There is evidence to sustain the verdict of the jury in finding that the appellant did hire the relator to refrain from voting.

The judgment of the court below is affirmed.